IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IDEXX LABORATORIES, INC. and IDEXX DISTRIBUTION, INC., <br><br> Plaintiffs, <br><br> v. <br><br> CHARLES RIVER LABORATORIES, INC. and CHARLES RIVER LABORATORIES INTERNATIONAL, INC., <br><br> Defendants. | Civil Action No. 15-668-RGA |

MEMORANDUM OPINION

Philip A. Rovner, Esq., Jonathan A. Choa, Esq., Potter, Anderson & Corroon LLP, Wilmington, DE; Daniel A. Boehnen, Esq. (argued), Grantland G. Drutchas, Esq., McDonnell, Boehnen, Hulbert & Berghoff LLP, Chicago, IL, attorneys for Plaintiffs IDEXX Laboratories, Inc. and IDEXX Distribution, Inc.

Jack B. Blumenfeld, Esq., Jennifer Ying, Esq., Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE; Douglas J. Kline, Esq. (argued), Srikanth K. Reddy, Esq., Brian T. Drummond, Esq., Goodwin Procter LLP, Boston, MA, attorneys for Defendants Charles River Laboratories, Inc. and Charles River Laboratories International, Inc.

July 1, 2016

*[signature]*
**ANDREWS, U.S. DISTRICT JUDGE:**

Presently before the Court is Defendants' motion to dismiss for failure to state a claim. (D.I. 14). The issues have been fully briefed. (D.I. 15, 16, 18). Oral argument was held on January 12, 2016. (D.I. 21). For the reasons set forth herein, the motion to dismiss is **DENIED**.

## I. BACKGROUND

Plaintiffs filed this patent infringement lawsuit against Defendants on July 31, 2015 (D.I. 1). Plaintiffs allege that Defendants infringe U.S. Patent Nos. 8,927,298 (the "'298 patent"), 8,945,945 (the "'945 patent), and 9,040,308 (the "'308 patent"). (*Id.*). On September 21, 2015, Defendants filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing that the patents-in-suit claim patent-ineligible subject matter. (D.I. 9). In response, Plaintiffs filed an amended complaint on October 7, 2015. (D.I. 12). On October 26, 2015, Defendants moved to dismiss the Amended Complaint, arguing that the patents-in-suit claim patent-ineligible subject matter. (D.I. 15).

The patents-in-suit are all directed to "a method of determining a presence or absence of an infectious disease in a population of rodents" through the use of blood samples placed on collection cards. *See, e.g.*, '298 patent at 8:57-9:16. Historically, to evaluate infectious disease in colonies, the prevailing practice required that laboratory animals be euthanized to allow for "collection of at least 100 µL of blood by cardiocentesis." *Id.* at 1:36-39. "Once collected, the whole blood sample is allowed to clot, which typically requires 2-12 hours, then whole blood is centrifuged and the serum is separated from the cellular (clotted) fraction." *Id.* at 1:39-42. Then, the serum is packed in a refrigerated Styrofoam box and shipped overnight to a facility. *Id.* at 1:43-46. By using known blood collection cards and immunoassay techniques, the claimed

2

invention "provide[s] a simplified and efficient method for sample collection analysis to ensure cost effective colony management." *Id.* at 1:51-52

## II. LEGAL STANDARD

Section 101 of the Patent Act defines patent-eligible subject matter. It provides: "Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. The Supreme Court has recognized an implicit exception for three categories of subject matter not eligible for patentability—laws of nature, natural phenomena, and abstract ideas. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014). The purpose of these carve outs is to protect the "basic tools of scientific and technological work." *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1293 (2012). "[A] process is not unpatentable simply because it contains a law of nature or a mathematical algorithm," as "an application of a law of nature or mathematical formula to a known structure or process may well be deserving of patent protection." *Id.* at 1293-94 (internal quotation marks and emphasis omitted). In order "to transform an unpatentable law of nature into a patent-eligible application of such a law, one must do more than simply state the law of nature while adding the words 'apply it.'" *Id.* at 1294 (emphasis omitted).

The Supreme Court recently reaffirmed the framework laid out in *Mayo* "for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." *Alice*, 134 S. Ct. at 2355. First, the court must determine whether the claims are drawn to a patent-ineligible concept. *Id.* If the answer is yes, the court must look to "the elements of the claim both individually and as an

3

'ordered combination'" to see if there is an "'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* (alteration in original). "A claim that recites an abstract idea must include 'additional features' to ensure 'that the [claim] is more than a drafting effort designed to monopolize the [abstract idea].'" *Id.* at 2357 (alterations in original) (quoting *Mayo*, 132 S. Ct. at 1297). "[S]imply appending conventional steps, specified at a high level of generality, to . . . abstract ideas cannot make those . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300. Further, "the prohibition against patenting abstract ideas cannot be circumvented by attempting to limit the use of [the idea] to a particular technological environment." *Alice*, 134 S. Ct. at 2358 (quoting *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010)). Thus, "the mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Id.* For this second step, the machine-or-transformation test can be a "useful clue," although it is not determinative. *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 716 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 2907 (2015).

Patent eligibility under § 101 is a question of law suitable for resolution on a motion to dismiss. *See OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015); *Content Extraction*, 776 F.3d at 1346. The Federal Circuit follows regional circuit law for motions to dismiss. *Content Extraction*, 776 F.3d at 1346. When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

The Federal Circuit has held that the district court is not required to individually address claims not asserted or identified by the non-moving party, so long as the court identifies a representative claim and "all the claims are substantially similar and linked to the same abstract

4

idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat. Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014) (internal quotation marks omitted), *cert. denied*, 136 S. Ct. 119 (2015).

### III. ANALYSIS

Claim 1 of the '298 patent reads:

A method of determining a presence or absence of an infectious disease in a population of rodents, the method comprising:

(a) providing a plurality of blood collection cards to a user responsible for a population of animals;

(b) providing instructions to the user comprising the following:

    (i) draw blood from an individual rodent;
    (ii) apply the blood to one of the plurality of blood collection cards;
    (iii) allow the blood sample to dry on the collection card;
    (iv) repeat steps i, ii, and iii at least once to provide the plurality of blood collection cards spotted with blood from a plurality of members from the population of rodents; and
    (v) transport the plurality of collection cards to a laboratory as a single unit;

(c) receiving the plurality of collection cards as a single unit from the user,

(d) extracting dried blood from the cards;

(e) analyzing the extracted blood for a presence or absence of at least one biological marker for an infectious agent indicative of an infectious disease, thereby determining the presence or absence of the infectious disease in the population; and

(f) reporting the results of the presence or absence of the infectious disease to the user.

'298 patent at 8:57-9:15. Claim 1 of the '945 patent reads:

A method of determining a presence or absence of an infectious disease in a population of rodents, the method comprising:

(a) providing instructions to a user responsible for a population of animals comprising the following:

    (i) draw blood from an individual rodent;
    (ii) apply the blood to one of a plurality of blood collection cards;
    (iii) allow the blood sample to dry on the collection card;

5

    (iv) repeat steps i, ii, and iii at least once to provide the plurality of blood collection cards spotted with blood from a plurality of members from the population of rodents; and

    (v) transport the plurality of collection cards to a laboratory as a single unit;

  (b) receiving the plurality of collection cards as a single unit from the user,

  (c) extracting dried blood from the cards;

  (d) conducting an immunoassay for analyzing the extracted blood for a presence or absence of at least one antibody for an infectious agent indicative of an infectious disease, thereby determining the presence or absence of the infectious disease in the population; and

  (e) reporting the results of the presence or absence of the infectious disease to the user

'945 patent at 9:6-30. Claim 1 of the '308 patent reads:

  A method of determining a presence or absence of an infectious disease in a population of rodents, the method comprising:

  (a) receiving a plurality of blood collection cards from a user responsible for a population of rodents, wherein the blood collection cards have at least one spot of dried rodent blood;

  (b) extracting the blood from the cards;

  (c) conducting an immunoassay for analyzing the extracted blood for a presence or absence of at least one antibody for an infectious agent indicative of an infectious disease, thereby determining the presence or absence of the infectious disease in the rodent population; and

  (d) reporting the results of the presence or absence of the infectious disease to the user.

'308 patent at 9:8-22. The parties agree that claim 1 of the '298 patent is representative. (D.I. 21 at 28, 34-35).

### A. *Mayo/Alice* Step One: Abstract Idea

"First, we determine whether the claims at issue are directed to [an abstract idea]." *Alice*, 134 S. Ct. at 2355. "The 'abstract ideas' category embodies 'the longstanding rule that an idea of itself is not patentable.'" *Id.* (internal quotation marks omitted) (quoting *Gottschalk v.*

6

*Benson*, 409 U.S. 63, 67 (1972)). In the wake of *Alice*, "[p]recision has been elusive in defining an all-purpose boundary between the abstract and the concrete." *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1345 (Fed. Cir. 2015). The Supreme Court has recognized, however, that "fundamental economic practice[s]," *Bilski*, 561 U.S. at 611, "method[s] of organizing human activity," *Alice*, 134 S. Ct. at 2356, and mathematical algorithms, *Benson*, 409 U.S. at 64, are abstract ideas. Additionally, the Federal Circuit recently found that claims were not directed to an abstract idea where "the focus of [those] claims [was] on the specific asserted improvement in computer capabilities . . ., [rather than] on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish, LLC v. Microsoft Corp.*, 2016 WL 2756255, at *5 (Fed. Cir. May 12, 2016).

Defendants argue that the representative claim is directed to the abstract idea of "analyzing blood and reporting results." (D.I. 15 at p. 11). Plaintiffs contend that this is an overbroad generalization which fails to account for the "concrete steps specifically directed to an improved method." (D.I. 16 at 16). Plaintiffs also analogize the claim at issue here to those found patentable in *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245 (Fed. Cir. 2014).

In addressing the first step of *Mayo/Alice*, a court should examine the "heart" of the claims. *Ultramercial*, 772 F.3d at 714. Here, the steps of claim 1 are directed to the abstract idea of collecting, analyzing, and reporting results. This well-known abstract idea is not meaningfully different from those found abstract in numerous other cases. *See, e.g., OIP Techs.*, 788 F.3d at 1361-62 (claims directed to method of testing prices, collecting statistics on customer reactions, estimating outcomes, and acting on those estimated outcomes were abstract); *Content Extraction*, 776 F.3d at 1347 (claims directed to collecting, recognizing, and storing data were abstract); *Neochloris, Inc. v. Emerson Process Mgmt. LLLP*, 140 F. Supp. 3d 763, 767, 769-71

(N.D. Ill. 2015) (claims covering "a method for (1) collecting data at a water treatment plant; (2) sending the data over an internet connection to a computer; (3) monitoring and analyzing the data with an ordinary computer and software; and (4) alerting the facility of any abnormalities" were abstract).

Plaintiffs argue that the claim is directed to "[s]pecific and [c]oncerete technology." (D.I. 16 at 15-17). Additionally, Plaintiffs contend that the claim at issue is not abstract because it does not "involve[] steps that could have been performed by a human entirely divorced from any technology." (*Id.* at 17). The claimed method's reliance on technology does not, by itself, confer eligibility. "Narrowing the abstract idea . . . [by] 'attempt[ing] to limit the use' of the abstract idea 'to a particular technological environment' . . . is insufficient to save a claim." *Ultramercial*, 772 F.3d at 716 (quoting *Alice*, 134 S. Ct. at 2358); *see also In re TLI Commc'ns Patent Litig.*, 2016 WL 2865693, at *3 (Fed. Cir. May 17, 2016) ("not every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry"). Further, "the category of patent-ineligible abstract ideas is not limited to methods that can be performed in the human mind." *Cyberfone Sys., LLC v. CNN Interactive Grp., Inc.*, 558 F. App'x 988, 992 (Fed. Cir. 2014); *see also Content Extraction*, 776 F.3d at 1347-48 (claims that required the use of a scanner and a computer were abstract).

Plaintiff's reliance on *DDR Holdings*' "rooted in technology" language is similarly misplaced. In *DDR Holdings*, the Federal Circuit stated that "identifying the precise nature of the abstract idea [was] not as straightforward as in *Alice*" or other cases. *DDR Holdings*, 773 F.3d at 1257. The court then simply assumed that the patent-in-suit was directed to an abstract idea, and proceeded to *Mayo/Alice* step two. *See id.* ("[U]nder any of these characterizations of the abstract idea, the '399 patent's claims satisfy *Mayo/Alice* step two.").

8

Plaintiffs contend that the patents-in-suit are directed to specific "improved methods" and that Defendants' "over-generalized characterization of the claims" does not capture "the narrow scope of the claims." (D.I. 16 at 15-16). When the Federal Circuit found that the claims in *Enfish* were not directed to an abstract idea, it explicitly stated that "the claims [were] not simply directed to *any* form of storing tabular data, but instead [were] specifically directed to a *self-referential* table for a computer database." *Enfish*, 2016 WL 2756255, at *6. The claims described "a specific type of data structure designed to improve the way a computer stores and retrieves data." *Id.* at *8. Thus, the "level of abstraction" employed by the court in describing the claims must be consonant with the level of abstraction expressed in the claims themselves. *Id.* at *6; *see also Alice*, 134 S. Ct. at 2354 ("we tread carefully in construing this exclusionary principle lest it swallow all of patent law"). "This case, unlike *Enfish*, presents a 'close call[] about how to characterize what the claims are directed to.'" *BASCOM Global Internet Servs., Inc. v. AT&T Mobility LLC*, 2016 WL 3514158, at *5 (Fed. Cir. June 27, 2016) (alteration in original). While there is always a risk of "oversimplif[ying]" claims in a way that "downplay[s] the invention's benefits," *Enfish*, 2016 WL 2756255, at *7, the representative claim at issue here is not "unambiguously" directed to a specific improvement. *BASCOM*, 2016 WL 3514158, at *5. Instead, the abstract idea predominates each step of the claim. Thus, while the claim may implement the abstract idea in a specific and novel way, the "character [of the claims] as a whole is directed to excluded subject matter." *Internet Patents*, 790 F.3d at 1346. Therefore, I "defer . . . consideration of the specific claim limitations' narrowing effect for step two." *BASCOM*, 2016 WL 3514158, at *5.

**B. *Mayo/Alice* Step Two: Inventive Concept**

9

The determination that a patent is directed to an abstract idea "does not render the subject matter ineligible." *Internet Patents*, 790 F.3d at 1346. Having decided that the patent's claims are directed to an abstract idea, the Court must next "determine whether the claims do significantly more than simply describe the abstract method." *Ultramercial*, 772 F.3d at 715. Since "a known idea, or one that is routine and conventional, is not inventive in patent terms," this analysis "favors inquiries analogous to those undertaken for determination of patentable invention." *Internet Patents*, 790 F.3d at 1346. Neither "[a] simple instruction to apply an abstract idea on a computer," nor "claiming the improved speed or efficiency inherent with applying the abstract idea on a computer" satisfies the requirement of an "inventive concept." *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367 (Fed. Cir. 2015). Further, "simply appending conventional steps, specified at a high level of generality . . . cannot make . . . ideas patentable." *Mayo*, 132 S. Ct. at 1300.

In the second step of *Alice*, we "ask whether the remaining elements, either in isolation or combination with the other non-patent-ineligible elements are sufficient to 'transform the nature of the claim into a patent-eligible application.'" *Intellectual Ventures*, 792 F.3d at 1367 (internal quotation marks omitted) (quoting *Alice*, 134 S. Ct. at 2358). Here, some of the non-patent-ineligible elements amount to no "more than 'well-understood, routine, conventional activity' already engaged in by those in the field." *Genetic Techs. Ltd. v. Merial L.L.C.*, 2016 WL 1393573, at *6 (Fed. Cir. Apr. 8, 2016) (quoting *Mayo*, 132 S. Ct. at 1294). For instance, the patent describes the required "blood collection cards" as prior art, and even provides examples of certain commercially-available brands. '298 patent at 3:11-15, 22-23, 47-47. The patent explains that the blood should be drawn from the rodent populations in the "typical[]" way and then placed on the blood collection card in the conventional manner. *Id.* at 3:30-47. The patent

10

discloses that blood samples should be extracted "using known solvents." *Id.* at 5:45-60. The blood samples should then be "analyzed for the presence or absence of a biological marker" through the use of Multiplex Fluorescent Immunoassay or "other know[n] immunoassay techniques known to those of skill in the art." *Id.* at 6:7-11; 7:6-42. Plaintiff further acknowledges that the use of immunoassay to "monitor the health of rodent populations by analyzing . . . rodent blood for one or more biomarkers of infectious disease" was "deemed to be the conventional protocol" for decades. (*Id.* ¶ 13).

The Federal Circuit has held that "recited physical components" fail to provide an inventive concept when they "behave exactly as expected according to their ordinary use." *TLI Commc'ns*, 2016 WL 2865693, at *7. The claims at issue in *TLI Commc'ns* recited generic telephone components and "steps that generically spell[ed] out what it mean[t] to 'apply [the abstract idea] on a telephone network.'" *Id.* Here, DBS and immunoassay[1] are used in an ordinary way—i.e., to collect dried blood and analyze biomarkers. In other words, they do exactly what they are designed to do. There is, however, something "else . . . in the claims before us" which supplies the requisite inventive concept. *Mayo*, 132 S. Ct. at 1297. "The inventive concept inquiry requires more than recognizing that each element, by itself was known in the art." *BASCOM*, 2016 WL 3514158, at *6. "[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces." *Id.* Here, DBS and immunoassay are not generic components which serve only to "limit the use of [the idea] to a particular technological environment." *Bilski*, 561 U.S. at 610-11. Rather, when examined as an ordered combination of limitations, they describe a specific, novel implementation of the

---

[1] The claim does not actually recite immunoassay by name, but instead requires that the extracted blood be "analyz[ed] . . . for a presence or absence of at least one biological marker for an infectious agent indicative of an infectious disease." '298 patent at 9:9-12. The specification, however, makes clear that this is accomplished through immunoassay techniques. *Id.* at 6:7-11; 7:6-42.

11

abstract idea of collecting, analyzing, and reporting. The representative claim includes the inventive concept of using DBS technology to monitor the health of rodent populations by analyzing blood for biomarkers of infectious disease. The elements expressing this inventive concept—i.e., the blood collection cards, the population of rodents, and the analyzing of biological markers with immunoassay—when viewed together, amount to "more than a drafting effort designed to monopolize the [abstract idea] itself." *Mayo*, 132 S. Ct. at 1297. Instead, they describe a specific solution to a problem which afflicted the field of the invention. *See DDR Holdings*, 773 F.3d at 1257. The advances over the prior art are clear. The invention permits one to monitor the health of rodent populations without euthanizing animals, waiting for blood to clot in a centrifuge, or shipping blood serum overnight in a refrigerated container. This inventive concept is sufficient to "transform the abstract idea . . . into a patent-eligible application of that idea." *TLI Commc'ns*, 2016 WL 2865693, at *5.

Defendant notes that the Beaudette reference, cited in the prosecution history, discloses the collection, transportation, extraction, and analysis of rodent blood, using DBS technology. The examiner relied in part on this reference during an obviousness rejection, stating that "Beaudette . . . differs from the instant invention in failing to teach analyzing the sample for the presence or absence of a biological marker for an infectious disease." (D.I. 24, Ex. A at p. 8). While the § 101 inventive concept analysis "is facilitated by considerations analogous to those of §§ 102 and 103," it is not a substitute for those statutory requirements. *Internet Patents*, 790 F.3d at 1347. Beaudette's teachings, though possibly relevant to a § 103 determination, fail to demonstrate the lack of an inventive concept.

I therefore conclude that claim 1 satisfies the two-step inquiry of *Mayo/Alice*. Since the parties have agreed that claim 1 is representative, I conclude the same with respect to the other claims in the patents-in-suit.

## IV.   CONCLUSION

For the reasons set forth above, the motion to dismiss is **DENIED**. An appropriate order will be entered.